ANDREWS, Presiding Judge,
dissenting.
I respectfully dissent for the following reasons: (1) the Knights failed to produce reliable and admissible expert testimony to prove on the issue of specific causation that Mr. Knight’s exposure to asbestos at the Scapa Dryer Fabrics, Inc. plant was a contributing cause of his mesothelioma; (2) the trial court erred by admitting unreliable expert testimony on the issue of specific causation; (3) the erroneous admission of this expert testimony requires that the judgment against Scapa be reversed; and (4) under the circumstances, the case should be remanded for a new trial.
It was undisputed that Mr. Knight was diagnosed in 2009 with malignant mesothelioma, a disease caused by inhalation of airborne asbestos fibers. Evidence at the jury trial showed that, from 1959 through the mid 1980s, Mr. Knight was exposed to airborne asbestos fibers from multiple sources involving multiple asbestos-containing products during work he performed with sheet metal, plumbing, dry wall, automobiles, and roofing. The jury considered evidence that two named defendants, Scapa and Union Carbide Corporation, and 30 non-party entities (including Georgia Pacific, LLC), were associated with these asbestos-containing products, and negligently exposed Mr. Knight to airborne asbestos during these two-and-a-half decades of his life.
As to Scapa, evidence showed that Mr. Knight worked at the Scapa plant as an independent contractor doing sheet metal work on “several” or “multiple” occasions between 1967 and 1973. On some of these occasions, he was near felt weaving looms at the plant that produced airborne asbestos lint or dust, or was near asbestos-containing pipe or boiler insulation at the plant when the insulation was removed and airborne dust was released. As to Union Carbide and Georgia Pacific, evidence showed that, while Mr. Knight was having a house constructed sometime between 1973 and 1975, he occasionally visited the construction site during a two-week period of time during which drywall was installed with the use of an asbestos-containing joint compound manufactured by non-party Georgia-Pacific which contained asbestos sold by Union Carbide. There was evidence that, during some of those visits, Mr. Knight was near airborne dust from the joint compound.
In addition to evidence of exposures to asbestos, the Knights produced expert opinion testimony in support of their claim that Mr. *95 Knight’s mesothelioma was caused by his exposures to asbestos. After considering this evidence, the jury rendered a verdict: (1) finding that Mr. Knight’s mesothelioma was caused in part by Scapa’s negligence, in part by Union Carbide’s negligence, and in part by Georgia Pacific’s negligence; and (2) assessing (pursuant to OCGA § 51-12-33 (c)) 40 percent of the fault to Scapa, 40 percent to Union Carbide, and 20 percent to Georgia Pacific. The jury’s total compensatory damage award was $7,000,000 for Mr. Knight’s pain and suffering; $500,000 for Mr. Knight’s medical expenses (reduced by the trial court to $467,672.37); and $3,000,000 for Mrs. Knight’s loss of consortium. The jury awarded $790 in punitive damages against Scapa. Based on 40 percent fault assessed to Scapa, the trial court entered a judgment against Scapa in the amount of $4,187,068.95.
Scapa contends that the expert opinion testimony produced by the Knights to establish causation was unreliable under former OCGA § 24-9-67.1; that the trial court erroneously denied its motion in limine seeking to exclude this testimony; and that the Knights failed to prove by reliable evidence that it caused or contributed to Mr. Knight’s mesothelioma. Accordingly, Scapa contends that the trial court erredby denyingits motions for a directed verdict and judgment notwithstanding the verdict on this ground.
As an essential element of their toxic substance tort claim against Scapa, the Knights were required to prove both general causation, whether the substance at issue “is capable of causing a particular injury or condition in the general population,” and specific causation, “whether a substance caused a particular individual’s injury.” Butler v. Union Carbide Corp., 310 Ga. App. 21, 25 (712 SE2d 537) (2011) (citation and punctuation omitted). As to general causation, it is undisputed that the Knights produced evidence that exposure to and inhalation of airborne asbestos fibers is capable of causing mesothelioma in the general population. As to specific causation, in a case where the plaintiff has multiple exposures to a toxic substance involving multiple defendants alleged to be joint tortfeasors, the issue with respect to a particular defendant is whether exposure to the substance involving that defendant caused or contributed to the plaintiff’s injury. John Crane, Inc. v. Jones, 278 Ga. 747 (604 SE2d 822) (2004). The jury found that the negligence of joint tortfeasors concurred to cause Mr. Knight’s mesothelioma, and that, as a joint tortfeasor, Scapa’s negligent exposure of Mr. Knight to asbestos contributed to his development of mesothelioma.
Georgia law clearly contemplates differing degrees of culpability among joint tortfeasors. Where the injury is the result of the concurring negligence of two or more parties, they may *96 be sued jointly or severally. It is well settled that an action may be maintained against two joint tortfeasors whose negligence contributes to produce an injury, even though the same obligations do not rest upon each with respect to the person injured. It is sufficient to support a recovery if the negligence of both be a contributing cause, even though one owes to the person injured a higher degree of care, and even though there be differing degrees of negligence by each.
Id. at 748-749 (citations, punctuation and emphasis omitted). Where the negligence of two or more parties concurs to cause an injury, there is no requirement that each individual tortfeasor’s negligent conduct be a “substantial” contributing factor to constitute a proximate cause of the injury; rather, the negligent conduct of an individual tortfeasor need only be a “contributing cause.” Id. at 747-752. Although proof of causation in a toxic substance tort claim generally involves questions regarding the level or dosage of the toxin to which the plaintiff was exposed, the plaintiff is not necessarily required to produce evidence of exposure at measured dosage levels to establish that an exposure was a contributing cause of the injury. Fouch v. Bicknell Supply Co., 326 Ga. App. 863, 868-869 (756 SE2d 682) (2014); Fulmore v. CSX Transp., Inc., 252 Ga. App. 884, 891-892 (557 SE2d 64) (2001), overruled on other grounds, Norfolk & Western R. Co. v. Ayers, 538 U. S. 135, 151, n. 11, 157 (123 SCt 1210, 155 LE2d 261) (2003). But a plaintiff cannot establish that an exposure was a contributing cause of the injury by proof of “any exposure” to the toxic substance, no matter how small, de minimis, or insignificant. Fulmore, 252 Ga. App. at 892. For example, in John Crane, supra, the Supreme Court observed that a “contributing cause” does not include “a de minim[i]s contribution to the injury,” and approved a jury instruction on contributing cause in a toxic substance claim on the basis that “the jury charge at issue would not have misled the jury into believing that it could award damages for a de minim[i]s exposure to asbestos.” John Crane, Inc., 278 Ga. at 750.
Rather, in toxic tort cases, proof of causation generally requires reliable expert testimony which is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury. The testimony must show at least a probable cause, as distinguished from a mere possible cause.
Fouch, 326 Ga. App. at 869 (citation and punctuation omitted); Rodrigues v. Georgia-Pacific Corp., 290 Ga. App. 442, 444 (661 SE2d 141) (2008).
*97 The Knights sought to establish specific causation with respect to Mr. Knight’s exposure to asbestos at the Scapa plant (and with respect to exposures involving other alleged joint tortfeasors) by producing expert opinion testimony from Jerrold Abraham, M.D., a pathologist, that “any exposure” Mr. Knight had during his life to airborne asbestos was a contributing cause of his development of mesothelioma. Scapa joined in a pre-trial motion in limine, filed pursuant to former OCGA § 24-9-67.1, seeking to exclude this expert opinion because it failed to meet reliability requirements set forth in the statute and in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993) and progeny (as adopted in the statute).[3] As set forth in Daubert, trial judges perform a “gatekeeping” role with respect to admission of expert testimony to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.” Id. at 589, 597; former OCGA § 24-9-67.1 (b). The party seeking admission of expert testimony has the burden of establishing by a preponderance of the evidence that the expert’s opinion is scientifically reliable. HNTB Georgia, Inc. v. Hamilton-King, 287 Ga. 641, 646 (697 SE2d 770) (2010); Allison v. McGhan Med. Corp., 184 F3d 1300, 1306 (11th Cir. 1999). Whether to admit expert opinion testimony as reliable is a legal determination for the trial judge that will not be disturbed absent an abuse of discretion. Mason v. Home Depot U.S.A., Inc., 283 Ga. 271, 279 (658 SE2d 603) (2008). Under Daubert, the trial judge must assess whether the reasoning or methodology underlying the expert’s testimony is scientifically valid. Daubert, 509 U. S. at 592-593. The reliability assessment generally involves consideration of many factors, which do not necessarily or exclusively apply to all experts in every case, including whether the method or theory underlying the testimony has been tested to see if it can be falsified; whether the method or theory has been subjected to peer review and publication; whether it has a known or potential rate of error; and whether it is generally accepted in the relevant scientific community. Daubert, 509 U. S. at 592-594; HNTB Georgia, 287 Ga. at 643.
Without holding a hearing, the trial court denied Scapa’s motion in limine seeking to exclude Dr. Abraham’s “any exposure” opinion as unreliable.[4] The trial court admitted expert opinion testimony at trial *98 from Dr. Abraham in support of specific causation that, to a reasonable degree of medical certainty, Mr. Knight’s mesothelioma was caused by his exposure to airborne asbestos at the Scapa plant. In support of his opinion, Dr. Abraham testified that malignant mesothelioma is a disease caused by inhalation of airborne asbestos fibers; that the disease is dose-responsive, in other words “it occurs more likely and more frequently in people that have more exposure”; that it may occur decades after exposure; and that the disease is extremely rare in the general population, despite the fact that the general population is constantly exposed to asbestos in the air at low background or ambient levels. When asked which asbestos exposures caused or contributed to Mr. Knight’s mesothelioma, Dr. Abraham testified that all of his individual exposures over a period of time — his cumulative exposure — caused his mesothelioma. Dr. Abraham explained the methodology underlying his opinion in answers to various questions about causation, as follows:
Q. If you have someone who has a recognized history of exposure to asbestos and they have a confirmed diagnosis of mesothelioma, what does that mean to you?
A. That’s enough to put one and one together.... Most of the world’s epidemiology that has shown the dose-response relationship and the causal relationship ... is based on that, on the history of exposure. . . .
Q. In someone with mesothelioma and documented asbestos exposure, which of those asbestos exposures over their life cause that disease?
A. It’s impossible to sort them out. That’s why the index is called cumulative exposure, the totality of their exposure____
Q. What does that mean?
A. [T]he cumulative exposure is what relates to their risk for developing the disease . . . the sum of all the individual exposures .... As the exposure goes up, the risk goes up. That would be what’s considered a positive dose-response *99 relationship. The greater the exposure, the greater the risk. . . . And this can only be measured in a population because in the individual that gets the disease, their risk is a hundred percent. . . .
Q. Knowing that [Mr. Knight] has an asbestos-related mesothelioma, his risk is a hundred percent, is what you just said?
A. He’s got it so there’s no measure except for risk, he’s got the disease. . . .
Q. [A]re each of the exposures that he’s described in this case, if you add them all together, you add up to that hundred percent?
A. You add up to his cumulative exposure. At present there’s no way to sort out how much one or the other contributed but for each of those individual exposures [,] since there is no safe known threshold for exposure for mesothelioma ... if he’d only had any one of those exposures in that hypothetical... and developed mesothelioma, that would have been enough to cause it.
Based on this methodology, Dr. Abraham expressed his opinion, that to a reasonable degree of medical certainty, any and every exposure to asbestos that Mr. Knight experienced at the Scapa plant was a contributing cause of his mesothelioma. Dr. Abraham’s opinion was that, since Mr. Knight’s exposure to asbestos at the Scapa plant was more than zero, that exposure was a contributing cause of his mesothelioma.[5]
In Butler, 310 Ga. App. 21, we concluded that the trial court properly exercised its discretion to exclude as unreliable expert opinion testimony from a pathologist using the same “any exposure” methodology to prove, on the issue of specific causation, that the plaintiff’s exposure to the defendant’s asbestos-containing product was a contributing cause of the plaintiff’s mesothelioma. In that case, the methodology underlying the expert’s “any exposure” opinion (also known as the “no threshold” or “linear non-threshold” models for causation) was rejected as not testable, scientifically unreliable, and not the product of reliable principles and methods under former OCGA § 24-9-67.1 (b) (2). Butler, 310 Ga. App. at 24, 27, 38, 40-41, 43-44, 47. As an appendix, Butler attached the trial court’s detailed *100 order considering the methodology underlying the pathologist’s opinion that “any exposure” to asbestos caused the plaintiff’s mesothelioma. The trial court noted the logical inconsistency of a methodology that presumes there is no threshold exposure level necessary for asbestos to cause mesothelioma, while admitting that virtually everyone in the general population has inhaled some asbestos fibers and the disease remains extremely rare. Id. at 40-41. Citing to the Reference Manual on Scientific Evidence, 33 (Federal Judicial Center, 2d ed. 2000) the trial court pointed out that the “any exposure” methodology’s reliance on exposure standards promulgated by regulatory agencies demonstrates a risk assessment analysis rather than a reliable conclusion on “the likelihood that a causal relationship in a specific case is more likely than not.” Id. at 41-42 (emphasis in original).
Other courts have examined the methodology underlying the “any exposure” opinion on specific causation and also rejected it as scientifically unreliable. In Betz v. Pneumo Abex LLC, 615 Pa. 504, 508-509, 539, 549-554 (44 A3d 27) (2012) the Pennsylvania Supreme Court rejected admissibility of “any exposure” expert opinion testimony to prove that every exposure to asbestos, no matter how small, contributes to cause asbestos-related disease. Betz concluded that the “any exposure” opinion was properly viewed as an expression of risk assessment rather than causation, and that it suffered from an irreconcilable conflict — one cannot maintain that a de minimis exposure is causative while also conceding that a disease is dose-responsive. Id. at 548-550. While appreciating the difficulties of establishing causation, the Court in Betz found it was not a viable solution to indulge in a fiction that every exposure to asbestos, no matter how minimal in relation to other exposures, creates a factual issue as to specific causation. Id. at 551. The Court concluded that, to sanction the “any exposure” opinion as reliable proof of specific causation would “subject defendants to full joint-and-several liability for injuries and fatalities in the absence of any reasonably developed scientific reasoning that would support the conclusion that the product sold by the defendant was a substantial factor in causing the harm.” Id. Similarly, in Nat. Bank of Commerce v. Assoc. Milk Producers, Inc., 191 F3d 858 (8th Cir. 1999), the Court found that the methodology underlying the “any exposure” opinion — that the risk of disease from even the smallest exposure “is not zero” — “falls woefully short of the degree of proof required by Daubert and its progeny,” and “does not provide a scientific basis for a jury to find that it was more likely than not that [a plaintiff’s] cancer was caused by [a defendant’s product].” Id. at 860-861 (citation and punctuation omitted). In Whiting v. Boston Edison Co., 891 FSupp. 12 (D. Mass. *101 1995), the Court applied Daubert to consider the reliability of the same specific causation methodology traveling under the name “linear nonthreshold model.” Id. at 23. According to Whiting,
[i]n layman’s terms, the model assumes that if a lot of something is bad for you, a little of the same thing, while perhaps not equally bad, must be so in some degree. The model rejects the idea that there might be a threshold at which the neutral or benign effects of a substance become toxic.
Id. Whiting rejected this methodology on the basis that it “cannot be falsified, nor can it be validated” and it “has no known or potential rate of error.” Id. at 25; accord Henricksen v. ConocoPhillips Co., 605 FSupp.2d 1142, 1166 (E.D. Wash. 2009) (linear non-threshold model is appropriate for predicting risks of low-level exposure, but not scientifically reliable to determine specific causation); Davidson v. Ga. Pacific LLC, 2014 WL 3510268 at *5 (W.D. La. 2014) (“every exposure” theory rejected under Daubert as unreliable to establish specific causation in a mesothelioma case because it was “not testable, and consequently cannot have an error rate”); Anderson v. Ford Motor Co., 950 FSupp.2d 1217, 1224-1225 (D. Utah 2013) (“every exposure” opinion excluded under Daubert as not testable and having no known error rate); Krik v. Crane Co., 2014 WL 7330901 at *4-5, n. 6 (N.D. Ill. 2014) (same and collecting citations showing that “[njumerous other courts also have barred ‘[a]ny [e]xposure’ opinions in asbestos and toxic tort actions.”).
For the reasons set forth in Butler, 310 Ga. App. 21, and numerous other authorities, as discussed above, I find a growing consensus that, as a matter of law, Dr. Abraham’s “any exposure” opinion on specific causation was based on unreliable methodology, failed the Daubert standard for reliable expert testimony, and was not “the product of reliable principles and methods” as required by former OCGA § 24-9-67.1 (b) (2). Accordingly, I conclude that the trial court abused its discretion and erred by denying Scapa’s motion in limine to exclude this testimony, and by admitting this testimony at trial to prove specific causation as to Scapa.
In the absence of the erroneously admitted specific causation testimony from Dr. Abraham, the Knights failed to produce any admissible evidence proving an essential element of their case — that Mr. Knight’s exposure to asbestos at the Scapa plant was a contributing cause of his mesothelioma. Moreover, it is clear from Dr. Abraham’s testimony that his “any exposure” methodology formed the basis for all of his expert opinions on specific causation, including *102 testimony that Mr. Knight’s exposures to asbestos at the Scapa plant were, as the majority opinion points out, “substantial causes” of Knight’s mesothelioma. Under Dr. Abraham’s methodology, any exposure to asbestos, no matter how small, can be characterized as a “substantial cause” because, in his opinion, all exposures contribute to cause mesothelioma, and “[a]t present there’s no way to sort out how much one or the other contributed____” There was no evidence at trial establishing any measured level or dosage of airborne asbestos to which Mr. Knight was exposed at the Scapa plant or from any other source to which he was exposed. Under the evidence, Dr. Abraham’s causation testimony based on the “any exposure” methodology erroneously invited the jury to find that any level of exposure (even de minimis) was sufficient to constitute a contributing cause of Knight’s mesothelioma, and was clearly a significant factor in convincing the jury to apportion 40 percent liability for exposures at the Scapa plant. See Johnson v. Knebel, 267 Ga. 853, 859 (485 SE2d 451) (1997) (reversal required because expert opinion was erroneously admitted that “went to the heart of the jury’s apportioning of liability” and “likely was a significant factor in the jury’s verdict”).
For these reasons, the judgment in favor of the Knights against Scapa should be reversed. It follows that the trial court erred by denying Scapa’s post-verdict motion on these grounds for judgment notwithstanding the verdict (or alternatively for a new trial). OCGA § 9-11-50. Where an appellate court determines that a motion for judgment notwithstanding the verdict was erroneously denied and reverses the judgment, OCGA § 9-11-50 (d) provides that “nothing in this Code section precludes it from determining that the appellee is entitled to a new trial or from directing the trial court to determine whether a new trial shall be granted.” On the present facts, I would find that the Knights are entitled to a new trial. At trial, the Knights relied on the trial court’s erroneous ruling that the expert causation evidence essential to their case was reliable and admissible. Although the Knights had notice in the trial court that Scapa was challenging the reliability of causation testimony based on the “any exposure” methodology, at the time, no appellate decision in Georgia had addressed the reliability of this testimony. The decision in Butler, supra, on this issue was not rendered until after final judgment in the trial court. Given the evidence in the record, I would conclude that this is not a case where a ruling on appeal excluding the expert causation testimony based on the “any exposure” methodology conclusively establishes that the Knights would not be able to produce sufficient reliable evidence of specific causation. Under the circumstances, I would remand the case for a new trial to give the Knights an opportunity to produce reliable expert testimony to prove specific *103 causation, subject, of course, to Scapa’s pre-trial right to challenge the reliability of any expert testimony, and the trial court’s exercise of its “gatekeeping” function under OCGA § 24-7-702 and Daubert.
Decided March 30, 2015
Reconsideration denied April 14, 2015
Hawkins Parnell Thackston & Young, H. Lane Young, M. Elizabeth O’Neill, S. Christopher Collier; Duane Morris LLC, William D. Barwick, for appellant.
Buck Law Firm, Robert C. Buck, for appellees.
I am authorized to state that Judge Branch joins in this dissent.

 The proceedings in this case were controlled by former OCGA § 24-9-67.1. The current statute, OCGA § 24-7-702, makes no significant changes and continues to apply the Daubert test for admission of expert testimony in civil cases.

 Under the facts of this case, I find no error in the failure to hold a hearing. Former OCGA § 24-9-67.1 (d) provided that “[u]pon motion of a party, the court may hold a pretrial hearing” to determine reliability under the statute, (emphasis supplied). Even where the record *98 does not include specific findings showing that the trial court has carried out its role as “gatekeeper” under the statute, generally a trial court will be presumed to have performed its official duties in accordance with the law. CSX Transp., Inc. v. McDowell, 294 Ga. App. 871, 872-873 (670 SE2d 543) (2008). On the present record, it appears that the expert deposition and report, along with the motion in limine and response, provided a sufficient basis for the trial court to determine the expert’s methodology and make a reliability determination under former OCGA § 24-9-67.1 and Daubert. Moreover, in satisfying Daubert’s gatekeeping requirement, the trial court has “the same kind of latitude in deciding how to test an expert’s reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether that expert’s relevant testimony is reliable.” Kumho Tire Co. v. Carmichael, 526 U. S. 137, 152 (119 SCt 1167, 143 LE2d 238) (1999).

 Scapa’s contention that Dr. Abraham’s expert testimony on specific causation was unreliable was preserved for appellate review by the trial court’s denial of Scapa’s motion in limine. Harley-Davidson Motor Co. v. Daniel, 244 Ga. 284, 285-286 (260 SE2d 20) (1979).